IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

ICON HEALTH & FITNESS, INC., a
Delaware corporation,

                    Plaintiff,

v.

JOHNSON HEALTH TECH NORTH
AMERICA, INC., a Wisconsin corporation,

                    Defendant.

REDACTED

**MEMORANDUM DECISION AND
ORDER GRANTING [56] MOTION FOR
PARTIAL SUMMARY JUDGMENT AND
DENYING [186] MOTION FOR PARTIAL
SUMMARY JUDGMENT**

Case No. 1:10-cv-209

District Judge David Nuffer

Cross-motions for partial summary judgment filed by Johnson Health Tech North America, Inc. ("JHT")[1] and Icon Health and Fitness, Inc. ("Icon")[2] dispute the applicability of a covenant not to sue contained in a settlement agreement between the parties (the "Settlement Agreement").[3] JHT contends that the covenant not to sue "bars Icon's present action,"[4] while Icon argues that the covenant not to sue does not apply to the accused infringing products at issue in this case.

The heart of the dispute regarding the covenant not to sue centers on whether the accused products at issue are "Covered Products" as defined in the Settlement Agreement. Predictably, JHT contends that the accused products are Covered Products, while Icon posits that they are

---

[1] [JHT's] Motion for Partial Summary Judgment ("JHT Motion"), docket no. 56, filed May 26, 2011.

[2] [Icon's] Motion for Partial Summary Judgment Dismissing [JHT's] Claim for Breach of Covenant Not to Sue ("Icon Motion"), docket no. 186, filed Nov. 30, 2012.

[3] The Settlement Agreement is attached as Exhibit A to the Declaration of Nathan Pyles in Support of [JHT's] Opposition to [Icon's] Motion for Preliminary Injunction ("Pyles Decl."), docket no. 20, filed under seal Jan. 10, 2011.

[4] JHT Motion at 2, docket no. 56.

not.  For the reasons set forth below, JHT's motion is granted and Icon's motion is denied.  Under

the broad scope of Covered Products as defined in the Settlement Agreement, the accused JHT

products in this case are Covered Products and are therefore protected by the covenant not to sue.

This suit is barred by the covenant not to sue.

## TABLE OF CONTENTS

BACKGROUND ................................................................................................................. 3

UNDISPUTED FACTS ..................................................................................................... 4

THE PARTIES' INTERPRETATIONS OF "COVERED PRODUCTS" .................................. 16

    Icon's Proposed Interpretation ...................................................................................... 17

    JHT's Proposed Interpretation...................................................................................... 21

DISCUSSION ................................................................................................................. 26

    I.  Summary Judgment Standard. ................................................................................. 26

    II.  Choice of Law. .................................................................................................... 26

    III.  Standard for Contract Interpretation. ..................................................................... 27

    IV.  Construction of the Covered Products Provision of the Settlement Agreement. ...... 28

        First Sentence....................................................................................................... 28

        First Sentence Summary ....................................................................................... 31

        Second Sentence .................................................................................................. 32

        Second Sentence Summary.................................................................................... 35

    V.  Application of the Covered Products Provision to the Accused JHT Devices. .......... 37

        '631 Patent Claims ............................................................................................... 37

        JHT's Pre-Effective Date Devices.......................................................................... 37

Order ............................................................................................................................ 43

## BACKGROUND

The parties have a long history of hotly-contested litigation.  In May 2009, with three

patent-related lawsuits pending between them, they entered into the Settlement Agreement to

Redacted

[5]

However, the Settlement Agreement itself has now become a point of contention.  The

dispute over the scope of the Settlement Agreement stems from the parties' respective

understandings of what the Settlement Agreement was intended to accomplish.  Icon argues that

the goal of the Settlement Agreement was to end the litigation between the parties at the time of

execution, while JHT contends that the Settlement Agreement was designed to end the litigation

as well as prevent future litigation between the parties, evidenced by the breadth of the Covered

Products provision, as well as inclusion of an alternative dispute resolution provision.

The Settlement Agreement contains Redacted

mutual covenants not to sue; and

Redacted                                           , among other provisions.

The mutual covenants not to sue, which depend upon interpretation of the Covered Products

provision, are the issue on these motions.

The mutual covenants not to sue read:

Redacted

---

[5] Settlement Agreement at 1, attached as Exhibit A to the Pyles Decl., docket no. 20.

Redacted

"Covered Products" are defined as:

Redacted

Because the mutual covenants not to sue necessarily depend on whether an accused product is a Covered Product, the scope of the Covered Products provision is very significant. A broad reading of the Covered Products provision affords greater protection to both parties from the threat of future lawsuits and liability for patent infringement, while a narrow reading promotes patent protection and increases the likelihood of future litigation between these two fierce market competitors.

## UNDISPUTED FACTS[6]

1.      In 2008, Icon sued JHT for patent infringement in the Eastern District of Texas,

*Icon Health & Fitness, Inc. v. Johnson Health Tech North America, Inc.*, No.5:08-CV-00026

---

[6] These undisputed facts were generated during the first day of a two-day hearing on May 22-23, 2013. The undisputed facts were compiled from the parties' respective briefs, and were reviewed and modified during the hearing until an agreed upon set of undisputed facts was developed. Some minor edits and consolidations have been made to improve readability without changing meaning. Capitalization of terms such as Effective Date has been standardized. Citations to sources of the undisputed facts include those contained in the parties' briefs.

(E.D. Texas) ("the Texas Suit").[7]  This was not the first time Icon had engaged a competitor in patent litigation.  In the eight years preceding the Texas Suit, Icon had filed over 20 patent infringement and invalidity lawsuits and counterclaims.[8]

2.      [JHT] responded [to the Texas Suit] with its own patent infringement suit against Icon in the Western District of Wisconsin, *Johnson Health Tech Co. Ltd. v. Icon Health & Fitness, Inc.*, No. 08-CV-750 (W.D. Wis.) (the "Wisconsin Suit").[9]  Icon [then filed] yet another patent infringement suit against [JHT] in the District of Utah, *Icon Health & Fitness, Inc. v. Johnson Health Tech North America, Inc.*, No. 2:08-CV-00139 (D. Utah) (the "Utah Suit").[10]

3.      Icon and [JHT] executed the Settlement Agreement [in 2009] to resolve the Texas, Utah and Wisconsin suits.

4.      Settlement negotiations were contentious and hard fought.  These sophisticated parties and their counsel spent two months working out the settlement provisions.  The terms of the ultimate agreement were heavily negotiated and countless drafts were exchanged.[11]

5.      The Settlement Agreement includes mutual covenants not to sue for patent infringement with respect to Covered Products, as that term is defined in the Settlement Agreement:

> Redacted

---

[7] [JHT's] Memorandum in Support of its Motion for Partial Summary Judgment at iii ("JHT Memo"), docket no. 61, filed under seal May 26, 2011 (citing Declaration of Nathan Pyles in Support of [JHT's] Motion for Partial Summary Judgment ("Pyles Supp. Decl.") ¶ 2 at 2, docket no. 59, filed May 26, 2011).

[8] JHT Memo at iii, docket no. 61 (citing Declaration of Kenneth M. Aldridge III in Support of [JHT's] Motion for Partial Summary Judgment ("Aldridge Decl.") ¶ 3 at 2, docket no. 58, filed May 26, 2011).

[9] *Id.* (citing Pyles Supp. Decl. ¶ 3 at 2, docket no. 59).

[10] *Id*. (citing Pyles Supp. Decl. ¶ 4 at 2, docket no. 59).

[11] *Id.* at iv (citing Pyles Supp. Decl. ¶ 6 at 2, docket no. 59).

Redacted

6.      Covered Products is defined Redacted                                    :

Redacted

7.      The "Effective Date" of the Settlement Agreement    Redacted

8.      The Settlement Agreement defines "Existing Patents"[13] as:

Redacted

9.      Redacted

---

[12] *Id.* (citing Pyles Decl. ¶ 12 at 4, docket no. 20).

[13] *Id*. at v (citing Settlement Agreement ¶ 1.5 at 1, attached as Exhibit A to the Pyles Decl., docket no. 20).

Redacted

10.     Icon filed this instant suit against [JHT] for infringement of United States Patent

Nos. 6,193,631 ("the 631 Patent") and 7,645,213 ("the 213 Patent") (collectively, the "Patents-in-

Suit").[14]  The Patents-in-Suit are Existing Patents.[15]

11.     On January 18, 2011, [JHT] filed its Answer and Counterclaims, denying

infringement and averring that the Patents-in-Suit were invalid.

12.     [JHT] counterclaimed for declaratory relief and for breach of the Settlement

Agreement by Icon, including breach of the covenant not to sue.

13.     [JHT] was producing, offering for sale, and selling the E3600iNetTV Upright

Bike, the R2600iNetTV Recumbent Bike, and the X6600iNetTV Elliptical Trainer starting in

June 2003.  [JHT] was also producing, offering for sale, and/or selling three treadmills, the T5X

Treadmill, the T7X Treadmill, and the T7XE Treadmill, and an elliptical trainer, the A7XE

Ascent Trainer, prior to May 31, 2009.  [JHT] first sold the T5X Treadmill on November 21,

2008, the T7X Treadmill on May 22, 2009, and the T7XE Treadmill on February 24, 2009.  The

A7XE Ascent Trainer was first offered for sale on March 11, 2009.  (These products are [ ]

referred to as the "[p]re-Effective Date [d]evices.")

14.     The pre-Effective Date [d]evices all had a USB port that allowed upload from a

flash drive or other memory storage device to the exercise devices ([ ] the software update

---

[14] *Id.* (citing Icon's Compl. ¶¶ 22-39 at 5-7, docket no. 2, filed Dec. 14, 2010).

[15] *Id.* (citing Declaration of John Scheller in Support of [JHT's] Opposition to [Icon's] Motion for Preliminary
Injunction, Ex. F, docket no. 15-6, filed Jan. 10, 2011; Aldridge Decl., Ex. B, docket no. 58-2, filed May 26, 2011).

feature ("SUF")).[16]

15.     JHT sells a line of commercial products, branded Matrix, which incorporated the SUF prior to the effective date of the Settlement Agreement.  The SUF is a "service tool" that is used "to fix bugs" or "software glitch[es]" "and in some cases to add features such as additional foreign language options."[17]  No other product line sold by JHT offered the SUF.

16.     The SUF of the Matrix products [is not used exclusively to] download individual new workouts [to the exercise machine].[18] Software updates for the Matrix products include application software and multiple workouts in the same update.[19]  The application software is the main program that runs the Matrix products.[20]  The workouts in the software update replicate factory loaded workouts previously loaded on the Matrix products at the factory.[21]

17.     The SUF process of the Matrix products was for use by technicians, not exercisers.  A service technician would typically be sent out to upload the latest software update, which often included functionally-revised workouts, at the customer's location of business.[22] One revision reduced treadmill starting speed from 1.0 mph to 0.5 mph.[23]  The other added a

---

[16] *Id*. at vi (citing Pyles Decl. ¶ 7 at 3, docket no. 20).

[17] [Icon's] Memorandum in Support of its Motion for Partial Summary Judgment Dismissing [JHT's] Claim for Breach of the Covenant Not to Sue ("Icon Memo") at xvii, docket no. 190, filed under seal Nov. 30, 2012 (citing Declaration of Kirk R. Harris in Support of Icon's Motion for Partial Summary Judgment Dismissing [JHT's] Claim for Breach of the Covenant Not to Sue ("Harris Decl."), Ex. 13, Kolman Dep., 33:2-10, docket no. 191-16, filed under seal Nov. 30, 2012; Harris Decl., Ex. 12, Gordon Dep., 20:12-20, docket no. 191-15, filed under seal Nov. 30, 2012; Harris Decl., Ex. 8, Najdouk Dep., 35:24-36:13, docket no. 191-11, filed under seal Nov. 30, 2012).

[18] *Id*. at xix (citing Harris Decl., Ex. 6, Wittenberg Dep., 14:18-15:5, docket no. 191-6, filed under seal Nov. 30, 2012).

[19] *Id.* (citing Harris Decl., Ex. 6, Wittenberg Dep. at 20:9-16, docket no. 191-6).

[20] *Id*. (citing Harris Decl., Ex. 6, Wittenberg Dep. at 19:6-16, docket no. 191-6).

[21] *Id*. (citing Harris Decl., Ex. 6, Wittenberg Dep. at 27:18-28:4, docket no. 191-6; Harris Decl., Ex. 13, Kolman Dep., 31:8-16, docket no. 191-16; Harris Decl., Ex. 14, JHT Suppl. Resp. to Interrog. No. 13 at 4, 5, 8, docket no. 191-17, filed under seal Nov. 30, 2012).

[22] *Id*. at xvii (citing Harris Decl., Ex. 25, JHT Resp. to Third Set of Interrogs. at 7, docket no. 191-28, filed under seal Nov. 30, 2012; Harris Decl., Ex. 14, JHT Suppl. Resp. to Interrog. No. 13 at 7-11, docket no. 191-17).

[23] *Id*. at xvii-xviii (citing Harris Decl., Ex. 14, JHT Suppl. Resp. to Interrog. No. 13 at 7-11, docket no. 191-17).

cool down period to a workout.[24]

18.     Prior to the [E]ffective [D]ate, software updates for the Matrix products were stored on a password protected file transfer protocol ("FTP") site to which a very limited number of JHT authorized technicians had access.[25]  Prior to the effective date, about five technicians had access to JHT's FTP site; no consumers have ever had access to the FTP site.[26]

19.     Because [the SUF] is designed for use only by an authorized technician, the owners' manuals for the Matrix products do not even disclose the existence of a USB port, the SUF, or how to use either [of these features].[27]

20.     JHT has not produced any publicly disseminated document that discloses the existence of a USB port or the SUF of the Matrix machines.[28]

21.     The instructions for downloading software updates to the Matrix products have been designated "Confidential-Attorneys Eyes Only" by JHT.[29]

22.     Prior to the effective date, JHT did not maintain a website from which consumers were authorized to download workouts.[30]

23.     The Matrix products do not have dedicated memory slots for storing of individual workouts.

24.     Prior to the effective date, JHT delivered USB drives containing software updates

---

[24] *Id.*

[25] *Id.* at xviii (citing Harris Decl., Ex. 25, JHT Resp. to Third Set of Interrogs. at 6-7, docket no. 191-28).

[26] *Id.* (citing Harris Decl., Ex. 12, Gordon Dep., 15:3-25, 16:1-19, 18:14-19:3, 27:8-21, docket no. 191-15).

[27] *Id.* at xxiii (citing Harris Decl., Ex. 9, JHT Resp. to Second Set of RFA at 6, RFA No. 32, docket no. 191-12, filed under seal Nov. 30, 2012).

[28] *Id.* (citing Harris Decl., Ex. 9, JHT Resp. to Second Set of RFA at 9, RFA Nos. 48-49, docket no. 191-12).

[29] *Id.* (citing Harris Decl., Ex. 14, JHT Suppl. Resp. to Interrog. No. 13 at 3-12, docket no. 191-17; *see also* Harris Decl., Ex. 24, JHT Suppl. Resp. to Interrogs. at 5-11, docket no. 191-27, filed under seal Nov. 30, 2012).

[30] *Id.* at xviii (citing Harris Decl., Ex. 8, Najdouk Dep., 62:8-17, docket no. 191-11).

by mail or hand delivery.[31]  The software updates were downloaded to the Matrix products

through a USB port on the back of the console or at the base of the machine.[32]  New workouts

for the [p]re-Effective Date [d]evices were included with software updates and could be obtained

via download from a Local Area Network, from an FTP web server over the internet, or, for the

[p]re-Effective Date treadmill and Ascent Trainer [d]evices, from the website of JHT's parent

company, Johnson Health Tech Co. Ltd.[33]  The workouts could then either be downloaded onto a

USB flash drive that was mailed or sent via the internet as an attachment to an email then

downloaded onto a USB flash drive.[34]  The workouts were then uploaded to the exercise device

by inserting the flash drive into the USB port on the exercise device.[35, 36]

26.     26.     Updates to the [p]re-Effective Date [d]evices could contain, but were not required

to contain, other software updates in addition to workouts.[37]

26.     26.     The [p]re-Effective Date [d]evices contained a local computer.[38]

27.     27.     The uploaded workouts in the update were stored in the [p]re-Effective Date

---

[31] *Id.* at xix (citing Harris Decl., Ex. 24, JHT Suppl. Resp. to Interrogs. at 4-8, docket no. 191-27; *see also* Harris Decl., Ex. 12, Gordon Dep., 24:2-25:21, docket no. 191-15).

[32] *Id.* (citing Declaration of David Johnson in Support of Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment ("Johnson Decl."), Ex. 3, Pyles Depo., 57:16-24, 59:4-9, 63:15-19, docket no. 76, filed under seal June 29, 2011; *see* Harris Decl., Ex. 9, JHT Resp. to Second Set of RFA at 6, RFA No. 28, docket no. 191-12).

[33] [JHT's] Memorandum in Opposition to the Motion for Partial Summary Judgment Dismissing [JHT's] Claim For Breach of the Covenant Not to Sue ("JHT Opp.") at 44, docket no. 204, filed under seal Jan. 8, 2013 (citing Pyles Supp. Decl., ¶ 8 at 3, docket no. 59).

[34] *Id.*

[35] *Id.* (citing Pyles Decl., ¶¶ 7, 9 at 3, 4, docket no. 20).

[36] Workouts for [JHT's] Pre-Effective Date [d]evices were obtained in a software update via download from a Local Area Network, from an FTP web server over the internet, or, for the Pre-Effective Date treadmill and Ascent Trainer Devices, from the website of JHT's parent company, Johnson Health Tech Co. Ltd.  (Pyles Supp. Decl., ¶ 8 at 3, docket no. 20.)  The updates could then either be downloaded onto a USB flash drive that was mailed, or sent via the internet as an attachment to an email then downloaded onto a USB flash drive.  (*Id.*)  The updates were then uploaded to the exercise device by inserting the flash drive into the USB port on the exercise device.  (Pyles Decl., ¶¶ 7, 9 at 3, docket no. 20.)

[37] JHT Opp. at 44, docket no. 204 (citing Harris Decl., Ex. 6, Wittenberg Dep., 18:15-20:16, docket no. 191-6).

[38] *Id.* (citing Harris Decl., Ex. 6, Wittenberg Dep., at 18:21-20:16, docket no. 191-6).

[d]evices' local computer read/write memory.[39]

28.     The [p]re-Effective Date [d]evices' local computer controlled the operation of the exercise device based on the uploaded workout in the update.

29.     Icon's Complaint avers that [JHT] infringed the Patents-in-Suit by selling exercise equipment including treadmills, stationary bicycles, and elliptical machines that utilize [JHT]'s LIVETRACK Technology.[40]

30.     [JHT]'s products that include LIVETRACK Technology are the LS 13.0E Elliptical, the LS 10.0E Elliptical, the LS 7.0B Recumbent Bike, the LS 13.0T Treadmill, LS 10.0T Treadmill, and LS 8.0T Treadmill (collectively, "the LS Devices").[41]

31.     The [LS Devices] also include a software update feature by which software updates that include factory loaded workouts are downloaded to the [LS Devices].[42]  The software update feature of the [LS Devices] is based on the software update feature of the pre-effective date Matrix products adapted for use with the [LS Devices'] user interface.[43] An estimated two weeks of programmer time was required to adapt the software update feature of the Matrix products for use in the [LS Devices].[44]

32.     An individual new workout can be downloaded from a website by consumers to their home computers.[45]  Consumers upload the individual new workout to a USB drive and then download the individual new workout to a [LS Device] through a USB port on the front of the

---

[39] *Id*. (citing Declaration of Matthew Wittenberg, ¶ 7 at 2, docket no. 206, filed under seal Jan. 8, 2013).

[40] Icon's Compl. ¶¶ 18, 22-39 at 4-7, docket no. 2.

[41] JHT Memo at vi, docket no. 61 (citing Pyles Supp. Decl. ¶ 7 at 3, docket no. 59).

[42] Icon Memo at xvi, docket no. 190 (citing Harris Decl., Ex. 7, Livestrong Elliptical Manual at 35-36, docket no. 191-8, filed under seal Nov. 30 2012).

[43] *Id*. (citing Harris Decl., Ex. 6, Wittenberg Dep., 12:11-17, docket no. 191-6).

[44] *Id*. (citing Harris Decl., Ex. 6, Wittenberg Dep., 12:11-24, docket no. 191-6).

[45] *Id*. at xiii (citing Harris Decl., Ex. 6, Wittenberg Dep., 15:6-18, docket no. 191-6; Harris Decl., Ex. 7, Livestrong Elliptical Manual at 36, docket no. 191-8).

[LS Device's] console.[46]   The consumer downloads the individual new workout into one of four memory slots specifically designated for storing individual new workouts.[47]   This feature of the [LS Devices] is referred to [ ] as the "new workout download feature" or "NWDF."

33.     The individual new workouts are "new" in the sense that they are materially different from, and in addition to, the standard workouts that are loaded on the [LS Devices] before they leave the factory ("factory loaded workouts").

34.     The individual new workouts for the [LS Devices] are maintained on a public website directly accessible to consumers and anyone else.[48]   The new workouts are available to consumers 24 hours a day, 7 days a week, and can be installed in the [LS Devices] in a matter of minutes.[49]   No confidential or proprietary information is stored on the website.[50]

35.     The [LS Devices] include almost 10,000 lines of software source code used to implement the NWDF.[51]   That code is not found on [JHT's] pre-[E]ffective [D]ate products to which software updates were downloaded using the software update feature discussed below.[52] The code is found in the following software files of the [LS Devices]: usb.c/usb.h, main.c to support access to USB drive, Xml_Code.c/Xml_Code.h, Xml_Driver.c/Xml_Driver.h, JISFlash.c/JISFlash.h, main.c to support Flash, uWorkout.c/uWorkout.h, main.c to support new

---

[46] *Id*. at xiii-xiv (citing Harris Decl., Ex. 7, Livestrong Elliptical Manual at 36, docket no. 191-8).

[47] *Id*. at xiv (citing Harris Decl., Ex. 7, Livestrong Elliptical Manual at 36, docket no. 191-8).

[48] *Id.* at xv (citing Harris Decl., Ex. 7, Livestrong Elliptical Manual at 36, docket no. 191-8; Harris Decl., Ex. 8, Najdouk Dep., 60:13-24, docket no. 191-11; Harris Decl., Ex. 9, JHT Resp. to Second Set of RFA at 5, RFA Nos. 24-25, docket no. 191-12).

[49] *Id.* (citing Harris Decl., Ex. 8, Najdouk Dep., 44:4-11, 45:16-21, docket no. 191-11; Harris Decl., Ex. 15, Park[ ] Talking Points, docket no. 191-18, filed under seal Nov. 30, 2012).

[50] *Id*. (citing Harris Decl., Ex. 8, Najdouk Dep., 60:25-61:4, docket no. 191-11).

[51] *Id.* (citing Harris Decl., Ex. 10, Wirthlin Report at 24-26, docket no. 191-13, filed under seal Nov. 30, 2012).

[52] *Id*.

uWorkout, and Program.c.[53]   An estimated two months of programmer time was required to write the code for the NWDF of the [LS Devices].[54]

36.     The Matrix products do not include the software used to implement the NWDF of the [LS Devices], or any equivalent software.[55]

37.     The promotional materials for the [LS Devices] mentioned the NWDF but no mention was made of any SUF.[56]

38.     Sales and training material provided by JHT describes the NWDF of the [LS Devices], but not the SUF.[57]

39.     Point of sale materials for the [LS Devices] promote the NWDF, but not the SUF.[58]

40.     Videos promoting [LS Devices] promote NWDF, but not the SUF.[59]

41.     New workouts for the LS Devices are obtained over the internet and downloaded to flash drives.

42.     The users of the LS Devices upload the new workouts from the flash drives to the LS Devices and use USB ports.[60]

43.     Similar to the [p]re-Effective Date [d]evices, the LS Devices also contain a local

---

[53] Id.

[54] Id.(citing Harris Decl., Ex. 6, Wittenberg Dep., 11:24-12:10, docket no. 191-6).

[55] Id. at xx (citing Harris Decl., Ex. 10, Wirthlin Report at 25-27, docket no. 191-13, filed under seal Nov. 30, 2012).

[56] Id. (citing Harris Decl., Ex. 16, docket no. 191-19, filed under seal Nov. 30, 2012; Harris Decl., Ex. 17, docket no. 191-20, filed under seal Nov. 30, 2012).

[57] Id. at xxi (citing Harris Decl., Ex. 18, docket no. 191-21, filed under seal Nov. 30, 2012; Harris Decl., Ex. 8, Najdouk Dep., 38:5-39:3, docket no. 191-11).

[58] Id. at xxii (citing Harris Decl., Ex. 19, docket no. 191-22, filed under seal Nov. 30, 2012; Harris Decl., Ex. 20, docket no. 191-23, filed under seal Nov. 30, 2012; Harris Decl., Ex. 8, Najdouk Dep., 39:5-40:7, 40:13-43:4, 43:25-44:1, docket no. 191-11).

[59] Id. (citing Harris Decl., Ex. 15, Park Talking Points, docket no. 191-18; Harris Decl., Ex. 8, Najdouk Dep. 44:3-45:21, docket no. 191-11).

[60] JHT Opp. at 45, docket no. 204 (citing Pyles Decl., ¶¶ 7, 18 at 3, 5, docket no. 20).

computer.

44.     The uploaded workouts are stored in the LS Devices local computer read/write memory.

45.     The LS Devices' local computer controls the operation of the exercise device based on the uploaded workout.

46.     On May 27, 2011, Icon provided infringement contentions on the '631 Patent, but omitted any contentions on the '213 Patent.[61]

47.     On May 27, 2011, based on [JHT's] discovery responses, Icon dropped any assertion that the LS Devices infringed the '213 Patent.[62]

48.     The USPTO granted Reexamination of the '213 Patent on June 6, 2011.[63]

49.     The USPTO granted Reexamination of the '631 Patent on June 9, 2011.[64]

50.     The Reexamination of the '213 Patent resulted in a final determination that all original claims are cancelled.[65]

51.     The Reexamination of the '631 Patent resulted in a final determination that claims 1-5 and 11-13 were cancelled.[66]  Claims 6 and 8 were determined to be patentable as amended; original claims 7, 9, and 10 were determined to be patentable as dependent on an amended claim; and new claims 14–22 were added and determined to be patentable.

52.     As a result of the '213 Reexamination proceeding new claims 28 and 29 were

---

[61] *Id.* at 47 (citing January 2013 Declaration of John C. Scheller ("Jan. Scheller Decl."), Ex. 3, docket no. 200-4, filed Jan. 8, 2013).

[62] *Id.*

[63] *Id.* (citing June 2011 Declaration of John C. Scheller in Support of [JHT's] Motion to Partially Stay Litigation ("June Scheller Decl."), Ex. C, docket no. 68-3, filed June 28, 2011).

[64] *Id.* (citing June Scheller Decl., Ex. B, docket no. 68-2, filed June 28, 2011).

[65] *Id.* (citing Jan. Scheller Decl., Ex. 10, docket no. 200-11, filed Jan. 8, 2013).

[66] *Id.* (citing Jan. Scheller Decl., Ex. 18, docket no. 200-19, filed Jan. 8, 2013); *see also* [Icon's] Reply in Support of [Icon's Motion] ("Icon Reply") at 15, docket no. 230, filed under seal Jan. 28, 2013.

determined to be patentable.

53.    Two new, significantly narrowed claims for the '213 Patent read:[67]

28. (New) A method as recited in claim 9, wherein a live trainer observes a user of the exercise device and generates the one or more control signals to control the exercise device in real time.

29. (New) A method as recited in claim 18, wherein a live trainer observes a user of the exercise device and generates the one or more control signals to control the exercise device in real time.

54.    [Icon's] infringement contentions are that the LS Devices infringed claims 6, 7, 8, and 10 of the '631 Patent.

55.    None of the '631 Patent original or amended claims address whether or how read/write memory is allocated, whether the read/write memory must have dedicated slots, what effect the workout downloads have on existing memory, what portion of, if any, memory is retained, erased or overwritten, or anything about the amount of software code that must be utilized to upload workouts.[68]

56.    For the [']631 patent, the only references to memory in any of the claims or amended claims address that "a modifiable script" "received over a wide area network" be "stored in a read/write memory of said local computer."[69]

57.    There is no reference in the original or amended claims of the [']631 patent to the amount of software code that must be utilized to upload workouts.[70]

58.    The original and amended [']631 Patent claims do not address or cover how many

---

[67] JHT Opp. at 48, docket no. 204 (citing Jan. Scheller Decl., Ex. 10, docket no. 200-11).

[68] Id. at 48-49 (citing Jan. Scheller Decl., Ex. 18, docket no. 200-19).

[69] Id. at 49 (citing Jan. Scheller Decl., Ex. 4, docket no. 200-5, filed Jan. 8, 2013; Jan. Scheller Decl., Ex. 18, docket no. 200-19,  e.g., "at least one associated local computer monitoring a use of said exercise apparatus and, in response thereto, controlling an operation of said exercise apparatus based upon a modifiable script stored in a read/write memory . . . .")

[70] Id. at 49 (citing Jan. Scheller Decl., Ex. 18, docket no. 200-19; Icon Compl., docket no. 2).

workouts need to be uploaded at a time, whether the content must be new or can be duplicative of factory loaded workouts, or the number of [workout combinations] that must be available.[71]

59.    The original and amended [']631 Patent claims only apply to downloads that come directly to the exercise device from a wide area network and not indirectly from a separate computer which downloads the workout and then requires the download to be physically transferred and then uploaded to the exercise device via a USB flash drive.[72]

60.    Subsequent to the [']213 Patent and [']631 Patent reexamination, Icon has not suggested in any way that any [JHT] product infringes any of the reissued claims of the '213 Patent.[73]

## THE PARTIES' INTERPRETATIONS OF "COVERED PRODUCTS"

Icon and JHT vigorously dispute the scope of Covered Products.  A broad interpretation of the Covered Products provision will effectively grant each party more "wiggle room" in the future without fear of litigation over patent infringement, while a narrow interpretation will protect patents but bring greater exposure to future litigation between these two market competitors.  Each of the parties was ordered[74] to provide a summary of its respective interpretations of the Covered Products provision, along with a graphic flow chart consistent with their interpretations.  The parties' respective interpretations are summarized below, along with each party's graphic flowchart.

---

[71] *Id.*

[72] *Id.*; Icon Reply at 20, docket no. 230 (Icon attempted to dispute this fact by arguing that it was misleading and irrelevant);

[73] *Id.* at 50 (citing Jan. Scheller Decl. ¶ 28 at 5, docket no. 200-1, filed Jan. 8, 2013).

[74] Transcript of May 23, 2013 hearing at 204:10-20; 205: 18-19, docket no. 268, entered May 31, 2013.

**Icon's Proposed Interpretation**

Icon interprets the Covered Products provision narrowly.[75]  It analyzes individual clauses contained within the Covered Products provision to support its interpretation.  Each of the clauses, followed by Icon's proposed interpretation, is set forth below.

Redacted

---

[75] Icon's Analysis and Effect on Definition of Covered Products, docket no. 325, lodged under seal Dec. 12, 2013.

[76] *See id.*

[77] *Id.*

Redacted

---

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.*

Redacted

        The following flow chart is a visual representation of Icon's interpretation of the needed steps to determine whether an accused product is a Covered Product:[86]

---

[83] *Id.*

[84] *Id.*

[85] *Id*.

[86] Icon's Flow Chart Analysis of Effect of Definition of Covered Products, docket no. 325, lodged under seal Dec. 12, 2013.

FLOW CHART ANALYSIS OF EFFECT OF DEFINITION OF "COVERED PRODUCTS"

Redacted

**JHT's Proposed Interpretation**

In contrast to Icon's proposed interpretation, JHT broadly construes the Covered Products provision to support its understanding of the intent of the Settlement Agreement. JHT argues that the Settlement Agreement was designed to not only end the litigation between the parties at the time of the Settlement Agreement, but also to prevent future litigation -- unless there were good faith allegations of infringement *unrelated* to the products, technologies, mechanisms, and/or product features that previously embroiled the parties in costly litigation that resulted in the Settlement Agreement.

Redacted

---

[87] JHT's Summary of Flow Chart Analysis of Effect of Definition of Covered Products at 3, docket no. 275, filed under seal June 6, 2013.

[88] *Id*.

[89] *See id*.

[90] *Id*.

Redacted

---

[91] *Id.*

[92] *See id.*

[93] *Id.*

[94] *Id.* at 4.

Redacted

---

[95] *Id.* at 4.

[96] *Id.*

[97] *Id.* Redacted

[98] *Id.* at 5.

Redacted

The following flow chart is a visual representation of the analysis needed to analyze whether an accused JHT product is a "Covered Product" under JHT's interpretation:[104]

---

[99] *See id.*

[100] *See id.*

[101] *Id.* at 6.

[102] *Id.*

[103] *Id.*

[104] Johnson Health Construction, docket no. 264-1, filed under seal May 22, 2013.

# JOHNSON HEALTH CONSTRUCTION

Redacted

**DISCUSSION**

**I.  Summary Judgment Standard.**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[105]  In applying this standard, the court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[106]  However, "the nonmoving party must present more than a scintilla of evidence in favor of his position."[107]  A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[108]

**II.  Choice of Law.**

The Settlement Agreement does not contain a choice of law provision and neither party has addressed this issue.  Icon is a Delaware corporation with its principal place of business in Logan, Utah.[109]  JHT is a Wisconsin corporation with its headquarters in Cottage Grove, Wisconsin.[110]  Because this case is pending in Utah, because Icon's principal corporate office in Logan, Utah, and because the Settlement Agreement was negotiated at least in part in Utah, Utah substantive law will be applied.[111]

---

[105] Fed. R. Civ. P. 56(a).

[106] *Mathews v. Denver Newspaper Agency LLP*, 649 F.3d 1199, 1204 (10th Cir. 2011) (internal quotations omitted).

[107] *Ford v. Pryor*, 552 F.3d 1174, 1178 (10th Cir. 2008) (citations omitted).

[108] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011).

[109] Icon's Compl. ¶1 at 1, docket no. 2; JHT's Answer ¶ 1at 2, docket no. 21, filed Jan. 18, 2011.

[110] Icon's Compl. ¶ 2 at 2, docket no. 2; JHT's Answer ¶ 2 at 2, docket no. 21.

[111] Although the choice of law issue was not directly addressed by the parties in the briefing related to these cross motions, both parties have previously relied on Utah law in other briefings filed with the court.  *See* Icon's opposition to JHT's motion for partial judgment on the pleadings at 3-10, docket no. 63, filed June 17, 2011; JHT's memorandum in support of its motion for partial judgment on the pleadings dismissing the third cause of the complaint at 5-7, docket no. 54, filed May 17, 2011.

### III.  Standard for Contract Interpretation.

"The general rules of contract interpretation under state law apply to settlement agreements."[112]  "Under well-accepted rules of contract interpretation, [courts] look to the language of the contract to determine the meaning and intent of the contracting parties."[113] "When interpreting a contract, [courts] look to the writing itself to ascertain the parties' intentions, and [ ] consider each provision … in relation to all of the others, with a view toward giving effect to all and ignoring none."[114]  "Where the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law."[115]

"Only if the language of the contract is ambiguous will [the court] consider extrinsic evidence of the parties' intent."[116]  Under Utah law, "ambiguity exists in a contract term or provision if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies."[117]

The Settlement Agreement is not rife with uncertain or missing terms or other facial deficiencies.  Although the parties dispute the scope of the covenant not to sue due to differing interpretations of the Covered Products provision, this dispute is not *per se* evidence of ambiguity.  Interpreting and giving effect to all of the Settlement Agreement's terms and provisions, the court holds that the Settlement Agreement is unambiguous.  Because the

---

[112] *Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 831 (10th Cir. 2005) (citations omitted).

[113] *Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 2009 UT 27, ¶ 25, 207 P.3d 1235 (citations omitted).

[114] *Green River Canal Co. v. Thayn*, 2003 UT 50, ¶ 17, 84 P.3d 1134 (ellipses in original) (citations omitted).

[115] *Café Rio, Inc.*, 2009 UT 27, ¶ 25 (internal quotation marks and citations omitted).

[116] *Id.*

[117] *Id.*

unambiguous Settlement Agreement is integrated,[118] no parol evidence will be considered when interpreting it.[119]

## IV.  Construction of the Covered Products Provision of the Settlement Agreement.

As set forth in greater detail below, the proper interpretation of the Covered Products provision of the Settlement Agreement is broad, consistent with the apparent intentions of the parties when entering into the Settlement Agreement.  Like the summaries of the parties' respective interpretations above, the court's interpretation is also broken up to analyze individual phrases of the Covered Products provision.

<u>First Sentence</u>

Redacted

---

[118] Settlement Agreement ¶ 6.7 at 8, attached as Exhibit A to the Pyles Decl., docket no. 20.

[119] *Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 11, 182 P.3d 326.

Redacted

---

[120] http://www.merriam-webster.com/dictionary/include?show=0&t=1385085876 (last visited December 10, 2013).

Redacted

First Sentence Summary

Redacted

Redacted

<u>Second Sentence</u>

Redacted

Redacted

---

[121] http://dictionary.reference.com/browse/relevant ( last visited December 10, 2013).

[12] Redacted

Redacted

---

[123] Settlement Agreement ¶ 1.1(b) at 2, attached as Ex. A to the Pyles Decl., docket no. 20 (emphasis added).

<u>Second Sentence Summary</u>

Redacted

<u>Graphic Summary of Construction of the Covered Products Provision</u>

Redacted

## V.  Application of the Covered Products Provision to the Accused JHT Devices.

The issue now is whether the accused JHT devices are Covered Products.  The '631 Patent is the only remaining Icon Patent at issue.[124]  Therefore, the issue is whether the accused JHT devices[125] are Covered Products in the context of the '631 Patent.

### '631 Patent Claims

Icon contends that the accused JHT devices infringe claims 6, 7, 8, and 10 of the '631 Patent.  None of those claims in the original or amended '631 Patent address whether or how read/write memory is allocated; whether the read/write memory must have dedicated slots; what effect the workout downloads have on existing memory; what portion, if any, of the memory is retained, erased, or overwritten; or how much of the software code must be utilized to upload workouts.  The original and amended '631 Patent claims only apply to downloads that come directly to the exercise device from a wide area network and not indirectly from a separate computer which downloads the workout and then requires the download to be physically transferred and then uploaded to the exercise device via a USB flashdrive.

### JHT's Pre-Effective Date Devices

JHT sold pre-Effective Date devices that contained a USB port that allowed uploads from a flash drive or other memory storage device to the exercise device.  This product feature was known as the software update feature ("SUF").  The SUF was not used exclusively to upload

---

[124] Only the '631 Patent will be evaluated when analyzing the Covered Products provision and the covenant not to sue.  Icon's argument (Transcript of May 22, 2013 hearing at 91:22-92:1, docket no. 272, filed June 5, 2013) that JHT must prove that the changes contained in the accused JHT devices do not infringe *any* of Icon's Existing Patents is incorrect.  Icon itself believed that the only patents of its portfolio of Existing Patents that were infringed by the accused JHT devices were the '631 Patent and the '213 Patent.  Icon's first cause of action - for infringement of its '213 Patent - was dismissed on July 22, 2013 after Icon failed to include any infringement contentions related to its '213 Patent.  (Order Dismissing Icon's First Cause of Action With Prejudice, docket no. 289, entered July 22, 2013.) An Icon suit against JHT for infringement of two of its Existing Patents cannot require JHT to analyze the balance of Icon's patent portfolio to prove that the accused products are Covered Products.

[125] As set forth in Icon's Compl., docket no. 2.

individual new workouts.  Rather, it was used by authorized service technicians, and only by

authorized service technicians, to upload application software updates, which could include

functionally revised workouts.  To perform the needed software update to the pre-Effective Date

devices, JHT would deliver USB flashdrives containing the software updates by mail or hand

delivery to an authorized service technician.  The technician could also download the software

update to the flashdrive from a Local Area Network, from an FTP web server over the internet,

or, for certain pre-Effective Date devices, from the website of JHT's parent company.

Thereafter, the service technician would upload the software updates to the exercise device by

inserting the flashdrive into the USB port of the exercise device, located either on the back of the

console or at the base of the machine.  The pre-Effective Date devices contained a local

computer, and the uploaded workouts (that were part of the software update) were stored in the

local computer's read/write memory.  The pre-Effective Date devices were controlled by the

local computer based upon the uploaded workouts contained in the update.  The SUF was not

utilized by the end user consumer, and the existence of the USB port or the SUF was not

disclosed to the end user consumer.

    After the Effective Date, JHT began to market and sell the LS Devices.  The LS Devices

contain what is referred to as the new workout download feature ("NWDF"), which is based on

the SUF feature of the pre-Effective Date JHT devices.  The NWDF allows consumers to upload

new workouts to the exercise machine.  The new workouts are "new" in the sense that they are

materially different from, and in addition to, the standard workouts that are loaded onto the

exercise machine from the factory.  Consumers access the new workouts by visiting a public

website, which is directly accessible by consumers or anyone else, and downloading the new

workouts to their home computers.  After downloading the new workouts to their home

computer, the consumer then uploads the new workout to a flashdrive and transfers the new workout to the LS Device by inserting the flashdrive into a USB port on the front of the LS Device's console.  These new workouts are then downloaded to the LS Device, which contains a local computer, and stored in one of four memory slots specifically designated for storing them. After downloading the new workouts, the new workouts are stored in the read/write memory of the LS Device's local computer, which controls the operation of the exercise device based on the uploaded workout.  In addition to the NWDF, the LS Devices continue to also utilize the SUF, though it is not promoted or marketed to the consumer.

   Under the Covered Products analysis, Redacted

Redacted

Redacted

 

Here, the only Existing Patent at issue is Icon's '631 Patent.  According to Icon's infringement contentions, claims 6, 7, 8, and 10 of the '631 Patent are allegedly infringed by the accused JHT devices.  Claim 6 of the '631 Patent states:[126]

> 6.  A local system comprising:
> at least one exercise apparatus;
> at least one associated local computer monitoring a use of said exercise apparatus and, in response thereto, controlling an operation of said exercise apparatus based upon a modifiable script stored in a read/write memory of said local computer, said script being received over a wide are [sic] network interface from a remote server system.[127]

---

[126] Icon Compl., Ex. B, U.S. Patent No. 6,193,631, docket no. 2.

[127] An Ex Parte Reexamination Certificate was issued by the USPTO on June 19, 2012.  (*See* Scheller Decl., Ex. 18, Ex Parte Reexamination Certificate U.S. Patent No. 6,193,631, docket no. 200-19, filed Jan. 8, 2013.)  As a result of reexamination, claims 1-5 and 6-11 of the '631 Patent were cancelled.  Claims 6 and 8 were determined to patentable as amended.  Claims 7, 9 and 10, dependent on an amended claim, were determined to be patentable.  Amended claim 6 reads:

> 6.  A local system comprising
> at least one exercise apparatus; *and*
> at least one associated local computer monitoring a use of said exercise apparatus and, in response thereto, controlling an operation of said exercise apparatus based upon a modifiable script stored in a read/write memory of said local computer, said *modifiable* script being received over a wide [are] *area* network interface from a remote server system, *the modifiable script defining an exercise session that is to be performed at the local system by a user;*
> *wherein the local system performs an act of determining whether the exercise session is modifiable or not;*
> *wherein the local system performs an act of modifying the exercise session in response to user activity or feedback, but only after first making a determination at the local system that the exercise session is modifiable.*

Claims 7, 8, and 10 are dependent on Claim 6.[128]  The *agreed upon* undisputed facts make clear

that the changes to the pre-Effective Date devices which are incorporated in the LS Devices are

not relevant to claims 6, 7, 8, and 10 Icon's '631 Patent (original or as amended) because those

claims do not cover the accused technologies in the LS Devices.

New workouts for the accused LS Devices are not obtained directly by the exercise

device.  Instead, they are obtained over the internet and downloaded to flash drives, which end

users then insert into the USB port on the consoles of the LS Devices to upload the new

workouts to the machines.  The LS Devices store these newly uploaded workouts in dedicated

slots of the read/write memory of a local computer contained within the LS Device (similar to

storage of the workouts in JHT's pre-Effective Date devices that utilized the SUF), which is also

utilized to operate the machine based on the new workouts.  Claims 6, 7, 8, and 10 of the '631

Patent do not address whether or how read/write memory is allocated or whether the read/write

memory must have dedicated slots, for example.  Indeed, the '631 Patent's only references to

memory in any of the claims or amended claims simply address that a "modifiable script"

"received over a wide area network" be "stored in a read/write memory of said local computer."

Perhaps most importantly, and most fatally to Icon's contention that the LS Devices are

not Covered Products, is that the original and amended '631 Patent claims only apply to

downloads that come directly to the exercise device from a wide area network and *not indirectly*

(as in JHT's LS Devices) from a separate computer which downloads the workout and then

requires the download to be physically transferred and then uploaded to the exercise device via a

USB flash drive.[129]  Hence, the modifications to the SUF of the pre-Effective Date devices

---

[128] Icon Compl., Ex. B, U.S. Patent No. 6,193,631, docket no. 2.

[129] Undisputed Fact No. 59, *supra* at 16.

contained in the NWDF of the accused LS Devices are not even covered by, much less relevant to, Icon's '631 Patent.[130]

Redacted

In sum,Redacted

. The changes made to the pre-Effective Date devices are not relevant to the '631 Patent, nor do they substantially change the operation of a feature covered by the '631 Patent.  The accused JHT LS Devices are therefore Covered Products and are protected

---

[130] This analysis applies only to claims 6, 7, 8, and 10 of Icon's '631 Patent, as those are the only claims at issue before the court.  This order does not address whether the accused LS Devices are relevant to or covered by any other Icon Existing Patent, or any other claims of the '631 Patent not specifically at issue in this case.

by the covenant not to sue contained in the Settlement Agreement.  Because the accused JHT LS

Devices are Covered Products protected by the covenant not to sue, Icon's suit against JHT for

infringement of the '631 Patent breached the Settlement Agreement by violating the covenant not

to sue.

**ORDER**

For the reasons set forth herein,

IT IS HEREBY ORDERED that Johnson Health Tech's motion for partial summary

judgment[131] is GRANTED.

IT IS FURTHER ORDERED that Icon's motion for partial summary judgment[132] is

DENIED.

IT IS FURTHER ORDERED that the parties shall meet and confer to agree on proposed

redactions to this memorandum decision and order, and shall email the court a proposed redacted

version in PDF format without a header within fourteen (14) days from the date of this order.

IT IS FURTHER ORDERED that the parties shall file redacted versions of their

respective interpretations of the Covered Products provision within fourteen (14) days of the date

of this order.

Signed December 17, 2013.

BY THE COURT:

David Nuffer
United States District Judge

---

[131] Docket no. 56.

[132] Docket no. 186.